UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

MONROE DIVISION

| | |
|---|---|
| DANIEL L. DIXON | CIVIL ACTION NO. 13-2776 |
| VERSUS | JUDGE ROBERT G. JAMES |
| HOME DEPOT U.S.A, ET AL. | MAG. JUDGE KAREN L. HAYES |

RULING

This is a products liability case bought by Plaintiff Daniel Dixon ("Dixon") pursuant to the Louisiana Products Liability Act (the "LPLA") against the Home Depot U.S.A., Inc. ("Home Depot"), Ryobi Technologies, Inc. ("Ryobi"), One World Technologies, Inc. ("One World"), and Techtronic Industries Co., Ltd. ("Techtronic") (hereafter collectively referred to as "Defendants").

Pending before the Court are Defendants' Motion *in Limine* to Exclude Experts Darry Robert Holt ("Holt") and Dr. Stephen Gass ("Dr. Gass.") [Doc. No. 75], Defendants' Motion *in Limine* to exclude Dr. Gass's prior trial testimony [Doc. No. 99], and Defendants' Motion for Summary Judgment [Doc. No. 76].

For the following reasons, Defendants' Motion *in Limine* to exclude Holt and Dr. Gass is GRANTED IN PART and DENIED IN PART. The Motion *in Limine* to exclude Dr. Gass's prior trial testimony is GRANTED. The Motion for Summary Judgment is GRANTED IN PART and DENIED IN PART.

I.     **FACTS AND PROCEDURAL HISTORY**

On January 7, 2011, Dixon was injured while operating a table saw, model BTS 12S ("the saw" or the "BTS 12S"), manufactured by Ryobi. Dixon purchased the saw from the Home Depot in Monroe, Louisiana, in September 2009 for approximately $150.00.

It is not entirely clear whether a "kickback" caused Dixon's injuries. A "kickback" occurs when the rear quadrant of the spinning saw blade catches the workpiece and either violently throws it back towards the front of the saw or lifts the workpiece vertically. During a kickback, the operator's hand often follows its current trajectory and is pulled into the saw blade. The Consumer Protection Safety Comission ("CPSC"), the governmental entity charged with overseeing table saw safety, estimates that table saws caused approximately 30,000 injuries in 2008.[1] [Doc. No. 81, Exh. 2, ¶ 21]. The CPSC attributed 40.5% of those injuries to kickbacks. *Id*.

When asked whether a kickback had caused his accident, Dixon testified in his deposition that "[I]t happened so quick, I don't know if it was a kickback or not." [Doc. No. 76, Exh. C, Deposition of Daniel Dixon ("Dixon Depo."), p. 27]. However, two of Dixon's experts, Holt and Kelly Mehler ("Mehler"), opine that Dixon's accident was most likely the result of a kickback. These experts also opine that the kickback was most likely caused by the saw's defective design. Defendants have moved to exclude Holt's opinions, but do not challenge Mehler's opinions.

The BTS 12S was equipped with a spreader-mounted blade guard, intended to prevent kickbacks, that consisted of three pieces: a spreader (a piece of metal sitting behind the blade, often referred to as a "splitter"); a hood guard attached to the spreader; and anti-kickback pawls, which are also attached to the spreader.

Holt opines that the saw was defectively designed primarily because the saw's spreader

---

[1] This figure is consistent with the CPCS's estimates from other years. *See* [Doc. No. 81, Exh. 2, ¶ 22].

mechanism is too flexible and wobbly,[2] because it does not include a rise-and-fall riving knife[3] or a tuning fork,[4] and because the saw does not have "Sawstop" flesh detection technology. Sawstop flesh detection technology causes a blade to stop and retract in milliseconds if it comes into contact with human skin.

Holt states that the riving knife is superior to the splitter on the subject saw because it is much sturdier and leaves less of a gap between the workpiece and the blade, which he opines significantly reduces the chance of a kickback. [Doc. No. 80, Exh. 2, Holt Declaration, p. 5, ¶ 24]. Moreover, Holt is of the opinion that Dixon's hand approached the blade from the front, and, as such, states that a tuning fork likely would have prevented the injury. *Id.* at ¶ 13. Mehler presents similar opinions.

Flesh detection technology was on the market, but had not yet been integrated into table saws similar to the BTS 12S in 2009. The technology was developed by Dr. Gass, an expert Defendants move to exclude in two separate motions *in limine*. *See* [Doc. Nos. 75 & 99]. Although Dixon designated Dr. Gass as an expert, he has refused to testify.

On December 19, 2014, Defendants filed a motion *in limine* to exclude Dr. Gass's and Holt's opinions and testimonies. [Doc. No. 75]. On January 23, 2015, Dixon filed an opposition memorandum. [Doc. No. 80]. Defendants filed a reply. [Doc. No. 88].

Also on December 19, 2014, Defendants filed the instant Motion for Summary Judgment.

---

[2] Holt opines that the flexibility of the spreader mechanism increases the likelihood of a kickback, instead of preventing it.

[3] A riving knife is a crescent-shaped piece of metal that sits directly behind the blade.

[4] A tuning fork is a metal guard that sits above the blade and is designed as a frontal barrier, preventing the operator's hand from contacting the blade on a direct approach.

[Doc. No. 76]. On January 23, 2015, Dixon filed an opposition memorandum[Doc. No. 80], to which Defendants replied. [Doc. No. 88].

On February 2, 2015, Defendants filed a second motion *in limine* regarding Dr. Gass, moving the Court to exclude Dr. Gass's declaration and prior trial testimony from other cases. [Doc. No. 99]. Dixon filed a memorandum in opposition [Doc. No. 110]; both parties filed supplemental memoranda. [Doc. Nos. 121 & 122].

## II. LAW AND ANALYSIS

### A. Motions in Limine

Under Federal Rule of Evidence 702, an expert opinion on scientific, technical, or specialized knowledge can be admitted only if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702. When faced with expert scientific testimony, the court must determine at the outset if the proponent of the evidence has proven its admissibility by a preponderance of the evidence. *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 592 n. 10 (citing FED. R. EVID. 104(a) and *Bourjaily v. United States*, 483 U.S. 171, 175-76 (1987)). Under Rule 702, a district court has considerable discretion in deciding whether to admit or exclude expert testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999) ("[W]e conclude that the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable."); *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 138-9 (1997) (reviewing district court's determination under abuse of discretion standard).

Reliability and relevance, under Rule 702, are the hallmarks of admissible testimony from an expert witness. *Daubert*, 509 U.S. at 589; *In re MBS Mgmt. Servs., Inc.*, 690 F.3d 352, 357 (5th Cir. 2012) ("[T]he trial judge serves as a gatekeeper to ensure the reliability and relevance of expert testimony."). In making its reliability determination, the court must assess whether the "reasoning or methodology underlying the testimony is scientifically valid." *Curtis v. M&S Petroleum, Inc.*, 174 F.3d 661, 668 (5th Cir. 1999). Regarding relevance, the court "must determine whether that reasoning or methodology can be properly applied to the facts in issue." *Id.* (Citing *Daubert,* 509 U.S. at 592-93). "The district court's responsibility is 'to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field.'" *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 247 (5th Cir. 2002) (quoting *Kumho*, 526 U.S. at 152)). However, the focus of reliability "must be solely on principles and methodology, not on the conclusions they generate." *Daubert*, 509 U.S. at 595.

1. *Holt*

    a) *Qualifications*

Defendants move to exclude Holt's testimony and opinions in their entirety on grounds that he is an "expert for hire" whose opinions have "been generated solely for the purpose of litigation." [Doc. No. 75, p. 10]. In response, Dixon highlights that Holt is a mechanical engineer with over thirty-five years of experience in evaluating the safety of the design of thousands of products (including table saws).

Holt is a qualified expert. He has run tests on saws equipped with riving knives and tuning forks, has tested and examined numerous types of table saws, and is familiar with Ryobi's entire

line. Holt has extensive experience investigating best practices in product design, including the design of table saws. Defendants' Motion *in Limine* is DENIED to the extent it seeks to exclude Holt altogether from testifying or offering his opinions regarding the BTS 12S.

### b) *Alleged Irrelevant Testimony*

Alternatively, Defendants seek to exclude the bulk of Holt's report on grounds that all but two of his conclusions are irrelevant to this case. Defendants, however, summarily proclaim what is relevant, and, from that conclusion, argue that all of Holt's other opinions are therefore irrelevant. This portion of Defendants' Motion is DENIED AS VAGUE, subject to Defendants' right to raise specific objections at trial.

### c) *Testimony that a Defective Guard Assembly Caused Dixon's Injuries*

Defendants move the Court to exclude Holt's testimony that the BTS 12S's guarding assembly increases the risk of kickback and is therefore defective. Defendants contend that Holt's conclusions in this regard are dependent on a kickback having occurred in the first place and argue that Holt has provided no reliable evidence that a kickback occurred.

Holt's testimony regarding the saw's guarding assembly is admissible. Holt opines that the saw is unreasonably dangerous because Defendants failed to engage in good design practices when designing the guarding assembly, that the guarding assembly is too flimsy/flexible, that a riving knife likely would have prevented a kickback, and that a tuning fork would have prevented Dixon's hand from making contact with the blade, even if there was no kickback. Holt's years of demonstrated engineering experience with table saws and his inspection of the BTS 12S's guarding assembly qualify him to offer opinions in this regard. Moreover, Defendants do not challenge the qualifications and opinions' of Dixon's expert, Mehler, who opined that a kickback occurred in this

case. Accordingly, Defendant's motion is DENIED to the extent it seeks to bar Holt from offering his opinion that the BTS 12S's guarding assembly was defectively designed.

#### d) *Testimony Regarding Flesh Detection Technology*

Defendants also move the Court to exclude Holt's opinions regarding the feasibility[5] of incorporating flesh detection technology as an alternative design under the LPLA and the effectiveness of that technology. Dixon highlights Holt's 30 years of mechanical engineering experience, much of it related to inspecting table saws, the fact that he has run tests on several saws incorporating the technology, and various reports–prepared by persons and entities other than Holt–regarding the potential cost of integrating flesh detection technology on similar table saws.

Holt's opinions regarding the feasibility of incorporating flesh detection technology are inadmissible because they are unsupported by any personal knowledge or any relevant testing and analysis. Holt offers no opinions based on his own testing that flesh detection technology could have been incorporated into a BTS 12S, or a saw like it, and his opinions regarding the economic feasibility of integrating the technology are not his own. While Holt would likely be qualified to offer opinions on the effectiveness of the technology, such opinions are moot considering the Court's ruling on Defendants' Motion for Summary Judgment below. Accordingly, Defendants' motion is GRANTED to the extent it seeks to preclude Holt from testifying regarding flesh detection technology.

---

[5] The existence of a feasible alternative design is a requirement under the LPLA. *See Thompson v. Nissan North America, Inc.,* 429 F. Supp. 2d 759, 769-76 (E.D. La. 2006) (citing LA. REV. STAT. ANN. § 9:2800.56).

      2.    *Dr. Gass*

          a)    *Declaration and Potential Trial Testimony*

Defendants move to exclude Dr. Gass's general declaration–which was not prepared specifically for this litigation–in which he outlines a number of opinions regarding flesh detection technology. Defendants argue the report is not competent summary judgment evidence because it was not signed under penalty of perjury. *See* FED. R. CIV. P. 56, advisory comment to FED. R. CIV. P. 56(c) ("28 U.S.C. § 1746 allows a written unsworn declaration" to be admitted as competent summary judgment evidence provided it was signed "under penalty of perjury."). Defendants also move for an order prohibiting Dr. Gass from testifying at trial.

Dr. Gass has refused to testify in this lawsuit, did not sign the declaration under penalty of perjury, and Dixon does not argue the declaration is admissible. Dixon further states he does not intend to call Dr. Gass at trial. Accordingly, Defendants' motion is GRANTED to the extent it seeks to exclude Dr. Gass's declaration and to the extent it seeks an order prohibiting Dr. Gass from testifying at trial.

          b)    *Prior In-Trial Testimony*

Defendants also move *in limine* to exclude Dr. Gass's trial testimony rendered in previous cases,[6] arguing this testimony is irrelevant and unreliable under *Daubert* because Dr. Gass has no

---

[6] In opposition to Defendants' Motion for Summary Judgement, Dixon cites Dr. Gass's testimony from the trials of *Osorio v. One World Technologies, Inc.,* CIV. A. NO. 06-10725-NMG (D. Mass. 2010) and *Stollings v. One World Technologies, Inc., et. al,* CIV. A. NO. 08-C-4006 (N.D. Ill. 2012) to support his claim that it was both economically and technologically feasible to incorporate flesh detection technology into table top saws in 2009. *See* [Doc. No. 81-4, Exh. 18, *Stollings* Trial Transcript, pg. ID #'s 1924*,* 1926, 1935-1946]; [Doc. No. 81-3, Exh. 7, *Osorio* Trial Transcript, pg. ID # 1811].

knowledge of the facts underlying this litigation. Defendants also highlight that Dr. Gass has refused to testify and argue that all evidence derived from him is hearsay.

Dixon concedes that he will not call Dr. Gass as a witness at trial, but claims certain portions of his prior trial testimony are admissible as exceptions to the hearsay rule under FED. R. EVID. 804(b) because Dr. Gass is unavailable, and Ryobi previously had an opportunity and similar motive to develop his testimony.[7]

Regardless of whether Dr. Gass's testimony would be generally admissible under FED. R. EVID. 804(b), it still contains expert opinions and must survive *Daubert* scrutiny. While it would appear that Dr. Gass would be qualified to testify with regard to flesh detection technology,[8] the Court cannot determine whether his "testimony's underlying reasoning or methodology is scientifically valid" and can be properly "applied to the facts at issue" in this case. *Daubert,* 509 U.S. at 580. Dr. Gass's opinions in *Stollings*[9] and *Osorio* were derived from uniquely tailored reports, prepared somewhere between 2009 and 2011, and unrelated to this litigation. The Court is not privy to those reports and cannot determine whether his calculations are sufficiently reliable or relevant to the facts of this case.

---

[7] The Rule provides in relevant part that former testimony, though hearsay, is nonetheless admissible if the declarant is currently "unavailable," the testimony was given at trial, and "the party against whom the testimony is now offered . . . had an opportunity and similar motive to develop the testimony by direct, cross, or redirect examination."). FED. R. EVID. 804(b).

[8] Dr. Gass invented the technology, founded a company based on it, and has been qualified on the subject across the country in similar trials.

[9] In *Stollings,* Dr. Gass offered testimony regarding what table top saws with flesh detection technology could sell for in a major retail store. *See id.* at p. 1936-1946.

Further, even if Dr. Gass's testimony were admissible under FED. R. EVID. 804(b) and *Daubert*, that testimony would not create factual issues that flesh detection technology was economically feasible in 2009. Because the Court finds that Holt is not qualified to testify regarding feasibility and because Dixon has failed to offer any other competent feasibility evidence, he would have to rely exclusively on Dr. Gass's prior testimony. However, Dr. Gass's testimony does not provide sufficient economic analysis for the factfinder to adequately consider the burden of implementing flesh detection technology into the BTS 12S.[10] Therefore, Defendants' Motion *In Limine* to exclude Dr. Gass's prior trial testimony is GRANTED.

    **B.**    **Summary Judgment**

        *1.*    *Standard of Review*

Under Federal Rule of Civil Procedure 56, summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c)(2). The moving party bears the initial burden of informing the court of the basis for its motion by identifying portions of the record which highlight the absence of genuine issues of material fact. *Topalian v. Ehrmann*, 954 F.2d 1125, 1132 (5th Cir. 1992). A fact is "material" if proof of its existence or nonexistence would affect the outcome of the lawsuit under applicable law in the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence is such that a reasonable fact finder could render a verdict for the nonmoving party. *Id.*

---

[10] *See infra,* pg. 13-14, Ruling on Defendants' Motion for Summary Judgment.

If the moving party can meet the initial burden, the burden then shifts to the nonmoving party to establish the existence of a genuine issue of material fact for trial. *Norman v. Apache Corp.*, 19 F.3d 1017, 1023 (5th Cir. 1994). In evaluating the evidence tendered by the parties, the Court must accept the evidence of the nonmovant as credible and draw all justifiable inferences in its favor. *Anderson*, 477 U.S. at 255. However, "a party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence. Thus, Summary Judgment is appropriate if a reasonable jury could not return a verdict for the nonmoving party." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 343 (5th Cir. 2007) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248(1986)).

### 2. *Choice of Law*

Because the Court is sitting in diversity, the Court applies the substantive law of Louisiana, the forum state. *See, e.g., Holt v. State Farm Fire & Cas. Co.*, 627 F.3d 188, 191 (5th Cir. 2010) (citing *Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938)).[11]

### 3. *Claims Arising Under the LPLA*

To maintain a successful products liability action under the LPLA, Dixon must establish four elements: (1) that the Defendants manufactured the saw; (2) that Dixon's injuries were proximately caused by a characteristic of the saw; (3) that this characteristic made the saw unreasonably dangerous; and (4) that Dixon's injuries arose from a reasonably anticipated use of the saw. *Stahl v. Novartis Pharms. Corp.,* 283 F.3d 254, 260-61 (5th Cir. 2002) (citing LA. REV. STAT. ANN. § 9:2800.54 (A)). It is undisputed that Defendant Ryobi manufactured the saw and that

---

[11] The parties agree that Louisiana law governs this case.

Dixon's injuries arose from a reasonably anticipated use of the saw, but Defendants argue the saw was not unreasonably dangerous, and, even if it was, that its design did not cause Dixon's injuries.

Under Louisiana law, a product's defective design can render it unreasonably dangerous. *See* LA. REV. STAT. ANN. § 9:2800.54(B). In order to carry his burden of showing the saw was unreasonably dangerous and defectively designed, Dixon must show that, at the time it left the manufacturer's control, "there (1) *existed* an alternative design that was capable of preventing the damage, and (2) the likelihood that the design would cause the damage and the gravity of that damage outweighed the burden on the manufacturer to use a different design." *Batiste v. Brown*, (La.App. 5 Cir. 1/24/12); 86 So.3d 655, 660 (citing LA. REV. STAT. ANN. § 9:2800.56 (emphasis added).

An alternative design "existed" if it was "at least conceived at the time the product left the manufacturer's control . . . ." *Moyer v. Siemens Vai Servs.*, LLC, CIV.A.No. 11-3185, 2013 WL 3293668, at *9 (E.D. La. June 28, 2013) (quoting John Kennedy, *A Primer on the Louisiana Products Liability Act*, 49 LA. L.REV. 565, 572 (1989)); *see also Wilson v. Hovart Corp.*, CIV.A.No. 95–2279, 1996 WL 117502, at *2 (E.D.La. 1996) (applying same definition of "existed" as the *Moyer* court); *Hunt v. McNeil Consumer Healthcare*, 297 F.R.D. 268, 273 (E.D. La. 2014) (same). Even if the proposed alternative was in existence, the plaintiff must present competent evidence showing that the risk avoided by his proposed alternative design outweighed the burden of adopting that design, which must include a consideration of the loss of utility and the added construction costs. *See Thompson v. Nissan N. Am., Inc.*, 429 F. Supp. 2d 759, 776 (E.D. La. 2006) *aff'd*, 230 F. App'x 443 (5th Cir. 2007) ("Plaintiffs' burden of proof requires them to show not only that there was an alternative, safer design, but also that the risk avoided by using the

alternative design (magnitude of damage discounted by the likelihood of its occurrence) would have exceeded the burden of switching to the alternative design (added construction costs and loss of product utility.") (internal citations and quotations omitted)).

When performing the risk/burden analysis, "courts typically require the level of detail and expert analysis that is necessary to allow the factfinder to effectively weigh the risk against the benefit." *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 181 (5th Cir. 1990) (abrogated on other grounds by *Little v. Liquid Air Corp.*, 37 F.3d 1069 (5th Cir. 1994)). In some cases, "the judge or the jury, by relying on background knowledge and 'common sense,' can 'fill in the gaps in the plaintiff's case, estimating the extent of the risk avoided, the costs of implementing the proposed design change, or the adverse effects of the design modification on the utility of the machine.'" *Graham v. Hamilton*, No. CIV.A. 3:11-609, 2012 WL 1252590, at *6 (W.D. La. Apr. 12, 2012) (citing *Lavespere,* 910 F.2d at 184). Where, as here, the complex nature of the product and proposed alternative design are "beyond the realm of the typical juror's background and common understanding, detailed expert testimony is required as to the risk of harm and burden of adopting the alternative design." *Graham,* 2012 WL 1252590, at p. 6-7.

Dixon alleges the saw was defectively designed primarily because the saw's spreader-mounted blade guard was too flexible, increasing the risk of kickback. He proposes that two alternative designs "existed" in 2009, both of which he argues would have prevented Dixon's injuries: (a) flesh detection technology; and (b) a modular blade guard with an independent riving knife and a tuning fork.

### *a)* *Flesh Detection Technology as an Alternative Design*

Defendants argue flesh detection technology did not exist for similar table top saws in 2009 and that, even if it had, it would not have prevented Dixon's injuries. Further, Defendants contend the technology was not economically or technologically feasible on table top saws in 2009.

Assuming, *arguendo*, that flesh detection technology "existed" for purposes of the LPLA in 2009 and that it would have prevented Dixon's injuries, Dixon still cannot overcome summary judgment on this claim because he has failed to present competent evidence regarding the economic feasibility of integrating the technology. Citing Dr. Gass's declaration and his testimony from prior trials, as well as Holt's opinions, Dixon argues it was economically feasible to place flesh detection technology into table top saws in 2009. However, Dr. Gass's declaration and prior trial testimony are inadmissible, and Holt is not a qualified expert on the topic.[12]

Moreover, even if Dr. Gass's prior trial testimony were admissible, it fails to provide sufficient analysis for the factfinder to weigh the risk avoided by the technology against the burden Ryobi would incur by adopting it. Dr. Gass's testimony from *Stollings* and *Osorio* provides insufficient analysis regarding the cost of re-design and manufacture and simply does not address the loss of utility that integrating the technology would cause, such as the increased weight and size, the lack of portability, and the attendant decrease in marketability. *See Thompson*, 29 F.Supp.2d 776-79 (summary judgment appropriate on defective design claim where plaintiffs' experts provided insufficient evidence of burden on car manufacturer and failed to address the adverse effect of purported design on utility of the car); *see also Graham,* 2012 WL 1252590, at *6 (summary judgment granted on defective automobile gas tank design claim where plaintiff failed

---

[12] *See supra,* pg. 8-10, Ruling on Defendants' Motion *in Limine*.

to offer evidence which would allow the factfinder to weigh the potential risk avoided by the proposed alternative design against the added construction costs and loss of utility that the alternative would cause). Thus, Defendants' Motion for Summary Judgment is GRANTED to the extent it seeks to dismiss Dixon's flesh detection alternative design claim.

### b) *Modular Blade Guard and Independent Riving Knife Alternative*

Because Defendants argue there is no evidence of a kickback in this case, they contend the saw was not defectively designed and that Dixon's other proposed alternative design–a modular blade guard with an independent riving knife–would not have prevented Dixon's injuries. In response, Dixon highlights Mehler's opinion that a kickback occurred in this case and that both Mehler and Holt attribute the kickback to a defectively designed guarding assembly. Mehler's expert opinions are not challenged in this regard.

Because it is undisputed that Defendant Ryobi manufactured the saw and that Dixon's injuries arose from a reasonably anticipated use of the saw, Dixon can overcome summary judgment on this alternative design argument if he generates factual issues that: (1) the saw's alleged defective design rendered it unreasonably dangerous, (2) the design proximately caused his injuries, (3) his proposed alternative existed in 2009 and "was capable of preventing" the injury, and (4) that the risk and gravity of harm presented by Defendants' failure to incorporate this alternative outweighed the burden of implementing that alternative. *Batiste,* 86 So.3d at 660 (citing LA. REV. STAT. ANN. § 9:2800.56(B)).

Dixon can overcome summary judgment on this alternative design claim. First, there are factual issues as to whether the subject saw's alleged defective guarding assembly rendered the saw unreasonably dangerous. Mehler and Holt, both qualified to testify in this regard, opine that the

guarding assembly was defectively designed and that the saw's design increased the likelihood of a kickback. *See* [Doc. No 81, Exh.11, Mehler Declaration, p. 7, ¶ 17]; [Doc. No. 80, Exh. 2, Holt Declaration, p. 5-7]. Second, Mehler opines Dixon's accident was caused by a kickback [Doc. No 81, Exh.11, Mehler Declaration, p. 6, ¶ 14]. Mehler is qualified to offer such an opinion, and his qualifications are not challenged. Moreover, Holt opines that a modular guard incorporating a tuning fork would have prevented Dixon's injuries, even if the accident was not caused by a kickback. Thus, factual issues exist as to whether the saw's design proximately caused Dixon's injuries, regardless of whether Holt is qualified to testify regarding the existence of kickback. Third, Defendants do not argue that these alternatives did not "exist" in 2009 (they clearly did), and Holt and Mehler testify that the proposed alternatives were capable of preventing Dixon's injuries. Finally, Defendants do not contest that the risk of harm presented by failing to integrate this alternative outweighs the minimal burden of doing so. Dixon presents competent evidence regarding the risk and burden, indicating a stark contrast between the substantial risk presented by a defective table saw design and the minimal burden of implementing this alternative.[13]

For these reasons, Defendants' Motion for Summary Judgment is DENIED to the extent it seeks dismissal of Dixon's claim that a modular blade guard with an independent riving knife offers a feasible alternative design.

---

[13] It costs less than a dollar to manufacture a riving knife, and Holt estimates that it costs $10.00 to manufacture a modular guard. [Doc. No. 80, Exh. 2, Holt Declaration, p. 15, ¶ 67].

### 4. *Claims for Strict Product Liability, Negligence, and Breach of Warranty*

Dixon pleads discrete claims for strict product liability, negligence, breach of the implied warranty of fitness for a particular purpose, and breach of the implied warranty of merchantability. [Doc. No. 1, Complaint, ¶¶ 22- 34]. However, these claims are subsumed by the LPLA.

The LPLA "establishes the exclusive theories of liability for manufacturers for damage caused by their products" and states that a "claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability." LA. REV. STAT. ANN. §9:2800.52. While the methods for establishing recovery under the LPLA "are predicated on principles of strict liability, negligence," and express and implied warranties, those theories are no longer independent theories of recovery against a manufacturer. *Jefferson v. Lead Indus. Ass'n, Inc.*, 106 F.3d 1245, 1251 (5th Cir. 1997). Thus, Defendants' Motion for Summary Judgment is GRANTED to the extent it seeks dismissal of Dixon's discrete claims for strict product liability, negligence, breach of the implied warranty of fitness for a particular purpose, and breach of the implied warranty of merchantability. Dismissal of these claims does not impact Dixon's claims arising under the LPLA.

### 5. *Attorney's Fees and Costs*

This case was initially filed in Georgia and transferred to this Court. *See* [Doc. No. 35]. In his original Complaint, Dixon sought attorney's fees under Georgia law. [Doc. No. 1, Complaint, ¶¶ 35-36]. Defendants argue that attorney's fees are not available under the LPLA, and Dixon does not oppose Defendants' argument.

The LPLA explicitly states that it does not provide for an award of attorney's fees. *See* LA. REV. STAT. ANN. §9:2800.53(5) ("Attorneys' fees are not recoverable under this Chapter.").

Defendants' Motion for Summary Judgment is accordingly GRANTED to the extent it seeks dismissal of Dixon's claim for attorney's fees.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion *in Limine* [Doc. No. 75] is GRANTED IN PART and DENIED IN PART. The motion is GRANTED to the extent its seeks to bar all testimony and opinions of Dr. Gass and to bar Holt from offering testimony regarding flesh detection technology. Defendants' Motion *in Limine* is otherwise DENIED.

Defendants' Motion *in Limine* to exclude Dr. Gass's declaration and prior trial testimony [Doc. No. 99] is GRANTED.

Defendants' Motion for Summary Judgment [Doc. No. 76] is GRANTED IN PART and DENIED IN PART. The motion is GRANTED to the extent it seeks dismissal of Dixon's claim that flesh detection technology offers a feasible alternative design; to the extent it seeks dismissal of Dixon's claims of strict products liability, negligence, breach of the implied warranty of fitness for a particular purpose; and to the extent it seeks to dismiss Dixon's claim for attorney's fees. The Motion for Summary Judgment is otherwise DENIED.

MONROE, LOUISIANA, this 13th day of May, 2015.

_____
ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE