# UNITED STATES DISTRICT COURT

## *WESTERN* DISTRICT OF LOUISIANA

### MONROE DIVISION

DANIEL L. DIXON                  CIVIL ACTION NO. 13-2776

VERSUS                         JUDGE ROBERT G. JAMES

HOME DEPOT U.S.A, ET AL.        MAG. JUDGE KAREN L. HAYES

## RULING

This is a products liability case brought by Plaintiff Daniel Dixon ("Dixon") pursuant to the Louisiana Products Liability Act (the "LPLA") against the Home Depot U.S.A., Inc. (the "Home Depot"), Ryobi Technologies, Inc. ("Ryobi"), One World Technologies, Inc. ("One World"), and Techtronic Industries Co., Ltd. ("Techtronic") (hereafter collectively referred to as "Defendants").

Pending before the Court are Defendants' Motions *in Limine* to "Bar Reference to Data/Reports of other Purportedly Similar Incidents" ("Motion on Similar Incidents") [Doc. No. 94] and to "Prohibit Reference to Alleged Defective Conditions in the Subject Saw that did not Cause or Contribute to Dixon's Accident" ("Motion on Defective Conditions") [Doc. No. 98].

For the following reasons, the Motion on Similar Incidents [Doc. No. 94] is DENIED. The Motion on Defective Conditions [Doc. No. 98] is GRANTED IN PART and DENIED IN PART.

## I. FACTS AND PROCEDURAL HISTORY

Dixon was injured on January 7, 2011, while operating a table saw, Ryobi model BTS 12S ("the saw" or the "BTS 12S"). Dixon purchased the saw in September 2009 from the Home Depot in Monroe, Louisiana. Dixon filed this personal injury lawsuit, seeking compensation under the LPLA.

The Court has found that genuine factual issues exist as to whether the saw's 3-in-1 blade guard was defective. *See* [Doc. No. 129].  Dixon's experts opine that the guard is defective because its spreader mechanism is too flexible and wobbly, because it does not include a rise-and-fall riving knife,[1] or a tuning fork.[2]  These deficiencies, and others, according to Dixon's experts, have severely inhibited use of the saw, which, they argue, is causing many people to remove the guard, increasing the risk of injury.  Dixon admits that he was using the 3-in-1 blade guard when his accident occurred and testified that he never had problems with it.

It is undisputed that the guard was in compliance with the applicable table saw safety standard, UL 987, at the time of its manufacture.  That standard was revised twice before Dixon's accident,[3] but those revisions were not made mandatory until 2010, approximately one year after the subject saw was manufactured.  The saw was not in compliance with those revisions.

Defendants anticipate that Dixon will attempt to enter two items into evidence: a report from the Consumer Product Safety Commission ("CPSC") and a letter from the CPSC to Underwriters Laboratories, Inc. ("UL").  The CPSC is the governmental entity charged with overseeing table saw safety.  In 1976, the CPSC issued a "Product Profile" report (the "CPSC Report") that addressed the troubling number of injuries related to various saw types, including table saws, portable power saws, and chain saws.  The Report solicited commentary and data from "consumers, industry, and other interested parties" to assist the CPSC in determining appropriate remedial actions. [Doc. No. 94,

---

[1]  A riving knife is a crescent-shaped piece of metal that sits directly behind the blade.

[2]  A tuning fork is a metal guard that sits above the blade and is designed as a frontal barrier, preventing the operator's hand from contacting the blade on a direct approach.

[3]  Changes to UL 987 were made in 2005 and 2007.

2

Exh. B, CPSC Report, p. 3].

UL is a safety consulting and certification company that, among other things, is the body charged with drafting and enforcing voluntary safety standards for the table saw industry.  On May 18, 1990, the CPSC sent a letter to UL (the "UL letter"), which outlined the need to make changes to the CPSC's bench and table saw standards because of the significant number of injuries associated with those saws.

Defendants move the Court *in limine* to bar Dixon from attempting to enter the CPSC Report, any other CPSC data or reports that he alleges to be "similar" to his accident,  and the UL letter into evidence, arguing this evidence is inadmissable on several grounds. [Doc. No. 94].  Dixon filed an opposition memorandum, [Doc. No. 105], to which Defendants replied. [Doc. No. 123].

Defendants also move the Court to prohibit Dixon from introducing any evidence or arguments regarding design defects that did not allegedly cause or contribute to Dixon's accident. [Doc. No. 98].  Dixon filed an opposition memorandum. [Doc. No. 109].  Defendants replied. [Doc. No. 127].

## II.    LAW AND ANALYSIS

### A.    The CPSC Report and the UL Letter

Defendants move the Court to bar reference to CPSC data/reports regarding incidents involving table saw injuries that Dixon alleges to be "similar" to his accident, but only specifically identify two documents:  (1) the 1976 CPSC Report and (2) the 1990 UL Letter.

#### 1.    *The 1976 CPSC Report*

Defendants argue the CPSC Report is irrelevant and inadmissible because Dixon cannot show that the incidents reported in the CPSC Report are "substantially similar" to his accident.

Moreover, even if Dixon could make this showing, Defendants assert the Report is hearsay and that its admission would be unfairly prejudicial.  Dixon argues it is relevant and admissible to show that Defendants had notice of an unreasonably dangerous condition and failed to address it.

The Court finds that the CPSC Report is admissible.  Evidence of similar incidents is relevant when its proponent demonstrates that the other incidents occurred under substantially similar circumstances. *Rodriguez v. Crown Equipment Corp.*, 923 F.2d 416, 418 (5th Cir. 1991).  However, the Fifth Circuit has recognized that the substantial similarity requirement is relaxed when used to show notice of a defective condition.  In these situations, the similarity requisite is satisfied by a showing of "reasonable similarity." *Edwards v. Permobil, Inc.*, Civ. A. No. 11-1900, 2013 WL 4508063, at *1 (E.D. La. Aug. 22, 2013) (citing *Ramos v. Liberty Mut. Ins. Co.*, 615 F.2d 334, 338–39 (5th Cir. 1980)).  Any difference in circumstances surrounding the occurrences "fall merely to the weight to be given to the evidence." *McGonigal v. Gearhart Indus., Inc.,* 851 F.2d 774, 778 (5th Cir. 1988) (internal citations and quotations omitted).

The CPSC Report is relevant to the issue of Defendants' knowledge that table saws were potentially unreasonably dangerous–that for decades an inordinate number of people were being injured by them.  The Court finds that Dixon has demonstrated that the data underlying the CPSC Report is reasonably similar to his accident, but does note that the Report contains irrelevant injury data (related to non-table saws) that could potentially lead to juror confusion.[4]  Thus, the parties shall

---

[4] Defendants also argue that, because it is undisputed that Dixon was using the 3-in-1 guard on his saw, the Report is irrelevant because it addressed concerns regarding the non-use of the 3-in-1 guard on table saws.  However, Dixon's expert, Kelly Mehler ("Mehler"), opines that the BTS12S's defective guard design is one of the primary reasons that people remove the guard. Thus, the fact that individuals were removing 3-in-1 guards dating back to the 1970's is relevant to Dixon's theory that Defendants were, or should have been, aware of deficiencies in the 3-in-1 guard and failed to adequately address them.

4

submit a jointly-proposed limiting instruction no later than July 2, 2015, along with their other pre-trial submissions.

Defendants' arguments that the CPSC Report is irrelevant because they did not enter the market until the year 2000 and that it cannot be proven that they were aware of the Report are unpersuasive.  Ryobi, a named Defendant in this action, has been a market participant for years preceding 2000.  Moreover, Dixon's theory of the case is that it has been well known for years that a concerning number of injuries were attributed to table saws and that Defendants and others in the industry failed to address the problems.  The CPSC Report supports Dixon's theory and is relevant to the issue of whether Defendants should have known of the problems facing the table saw industry, regardless of whether they actually saw the Report.

Further, the Court finds that the CPSC Report qualifies as an exception to the hearsay rule under FED. R. EVID. 803(8), which provides that an agency's records or statements of "factual findings from a legally authorized investigation" are admissible in a civil action unless the party opposing their admission can demonstrate that the "source of information or other circumstances indicate a lack of trustworthiness." FED. R. EVID. 803(8). The CPSC is authorized under the Consumer Product Safety Act to "maintain an injury information Clearinghouse to collect, investigate, analyze, and disseminate injury data, and information, relating to the causes and prevention of death, injury, and illness associated with consumer products." 15. U.S.C. § 2054(5)(a)(1).  Government reports and records are routinely allowed into evidence under the public records exception, even though they contain information gleaned from others. *See, e.g., Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169 (1988) (determining that Navy investigative report of airplane crash was admissible under 803(8)(C)).   Additionally, Defendants have not satisfied their

burden of demonstrating that the data underlying the CPSC Report is unreliable, and the CPSC Report therefore qualifies under the Rule 803(8) exception to the hearsay rule.

Finally, the Court finds that the probative value of the CPSC Report is not substantially outweighed by the potential for unfair prejudice under FED. R. EVID. 403.  Consequently, for the reasons stated above, the CPSC Report is admissible for the limited purpose of showing that Defendants had notice that table saws–even those implementing 3-in-1 guards like the subject saw– were potentially unreasonably dangerous.

### 2.      The 1990 UL Letter

Defendants argue the UL Letter is irrelevant because it was not addressed to Defendants and that there is no evidence to suggest Defendants ever examined it.  In response, Dixon contends the UL Letter is relevant to rebut Defendants' contention that its compliance with the applicable safety standard, UL 987, constitutes *prima facie* evidence that Dixon's saw was not defective.  Dixon also argues it is relevant and admissible to show that the design standard contained in UL 987 was not effective at preventing injuries.

The Court finds that the UL Letter is relevant and admissible.  Like the CPSC Report, the UL Letter demonstrates that entities closely connected with the table saw industry were aware of the troubling number of table saw injuries.  The Letter indicates that UL engineers concluded, in 1990, that the number of injuries was grounds for directing changes in table saw safety requirements.  The Letter is relevant and admissible on the issue of whether Defendants knew, or should have known, of the amount of injuries related to table saws, and users' general problems with the guard, despite compliance with UL 987.  A limiting instruction can cure any potential juror confusion.  Should the parties desire, they shall submit a jointly-proposed limiting instruction no later than July 2, 2015,

along with their other pre-trial submissions.

For the foregoing reasons, Defendants' Motion *in Limine* on Similar Incidents [Doc. No. 94] is DENIED in its entirety.

### B.   Alleged Defective Conditions that did not Cause or Contribute to Dixon's Accident

Defendants also move the Court to exclude any evidence or potential arguments regarding deficient design features that did not purportedly cause or contribute to Dixon's injuries. Specifically, Defendants move the Court to prohibit Dixon's expert, Mehler, from introducing opinions that:

- The saw's miter gauge has excessive play from side to side making it difficult and dangerous to make crosscuts.

- There is excessive vibration that can cause a cutoff to vibrate into the sawblade where it can be thrown at the user.

- The opening in the throat plate is too wide and can allow cutoffs to drop in and also be thrown back at the user.

- The throat plate is difficult to level with the sawtable.

- The size of the tabletop is too small to support many of the most common cuts that a user performs on a table saw

Mehler admitted in his deposition that none of the above defects directly caused Dixon's accident, and Dixon does not "intend to offer evidence that the subject saw was defective" for these reasons. [Doc. No. 109, Plaintiff's Opposition to Defendants' Motion *in Limine* on Defective Conditions, p. 1].[5]  Therefore, Defendants' motion is GRANTED to the extent it seeks exclusion of the above opinions.

---

[5] Dixon does, however, reserve the right to offer evidence showing that the saw's guarding assembly was shoddy and defectively designed.

Defendants also move the Court to exclude Mehler's opinions that Defendants' failure to employ an adequate and user-friendly guarding system denied Dixon the opportunity to safely operate the saw. Defendants highlight that Mehler, in forming this opinion, relied on a CPSC March 2011 "Survey of Injuries Involving Stationary Saw, Table and Bench Saws," which found that nearly 66 percent of users in table saw accidents did not have the provided blade guard installed. Defendants argue Mehler's opinion and the Survey are irrelevant because Dixon was using the 3-in-1 guard and admits he never had any problems with it.[6]

The Court finds that the Survey is relevant to issue of whether the guarding assembly was so defectively designed that the vast majority of people were not using it, and whether Defendants were on notice of such. Accordingly, Mehler's contested opinion and the Survey are admissible. The Court does not express an opinion as to whether the Survey is admissible, or inadmissible, for other purposes.

Defendants' Motion *in Limine* [Doc. No. 98] is GRANTED IN PART and DENIED IN PART. The Motion is GRANTED to the extent it seeks to prohibit Mehler's opinions that:

- the saw's miter gauge has excessive play from side to side making it difficult and dangerous to make crosscuts;

- there is excessive vibration that can cause a cutoff to vibrate into the sawblade where it can be thrown at the user;

- the opening in the throat plate is too wide and can allow cutoffs to drop in and also be thrown back at the user;

- the throat plate is difficult to level with the sawtable; and that

---

[6] In support of this argument, Defendants highlight portions of Mehler's deposition testimony where he stated that these statistics were not relevant to Dixon because he was using the guard. *See* [Doc. No. 98-3, Mehler Deposition, p. 72].

- the size of the tabletop is too small to support many of the most common cuts that a user performs on a table saw,

The motion is otherwise DENIED.

MONROE, LOUISIANA, this 16th day of June, 2015.

ROBERT G. JAMES
UNITED STATES DISTRICT JUDGE

9